UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**08 CV 6126**

)
FRANK B. FALKSTEIN, Individually and On )
Behalf of All Others Similarly Situated, )
)
Plaintiff, )     **CIVIL ACTION NO.:**
)
vs. )     **CLASS ACTION COMPLAINT**
)
NEXCEN BRANDS, INC., DAVID S. OROS, )     **JURY TRIAL DEMANDED**
ROBERT W. D'LOREN and DAVID B. )
MEISTER, )
)
Defendants. )
)

U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff, Frank B. Falkstein ("Plaintiff"), alleges the following based upon the

investigation by Plaintiff's counsel, which included, among other things, a review of the

defendants' public documents, conference calls and announcements made by defendants, United

States Securities and Exchange Commission ("SEC") filings, wire and press releases published

by and regarding NexCen Brands, Inc. ("NexCen" or the "Company"), securities analysts'

reports and advisories about the Company, and information readily available on the Internet, and

Plaintiff believes that substantial additional evidentiary support will exist for the allegations set

forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION AND OVERVIEW**

1.     This is a federal class action on behalf of purchasers of NexCen's securities

between May 10, 2007 and May 19, 2008, inclusive (the "Class Period"), seeking to pursue

remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     NexCen acquires and manages global brands, generating revenue through

licensing and franchising. They currently own and license the Bill Blass and Waverly brands, as

well as seven franchised brands. Two franchised brands - The Athlete's Foot and Shoebox New York - sell retail footwear and accessories. Five are quick-service restaurants - Marble Slab Creamery, MaggieMoo's, Pretzel Time, Pretzelmaker, and Great American Cookies.

3.      On May 19, 2008, the Company shocked investors when it announced that its recently filed 10-K did not take into account factors that significantly changed the Company's liquidity, *i.e.*, cash available for general use. Such factors included the accelerated-redemption feature of its bank credit facility, in connection with the Company's acquisition of Great American Cookies. Moreover, the Company stated that there was substantial doubt about its ability to continue as a going concern. The Company stated that it would undergo an independent review in order to make a determination. Finally, the Company announced that its prior financial guidance for 2008 was no longer applicable.

4.      Upon the release of this news, the Company's shares fell $1.95 per share, or 77.08 percent, to close on May 19, 2008 at $0.58 per share, on unusually heavy trading volume.

5.      The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that in order to finance its Great American Cookies acquisition, the Company agreed to an accelerated-redemption feature, which forced the Company to pay back half of the amount borrowed by a particular date; (2) that the Company could not comply with the accelerated-redemption feature; (3) that as a result, the Company would suffer a reduction in the amount of cash at its disposal; (4) that the Company was experiencing a continuous weakening in its financial condition due to its debt; (5) that the Company lacked adequate internal and financial controls; and (6) that, as a

result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

6.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

9.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, NexCen's principal executive offices are located within this Judicial District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## PARTIES

11.    Plaintiff, Frank B. Falkstein, as set forth in the accompanying certification, incorporated by reference herein, purchased NexCen's securities at artificially inflated prices during the Class Period and has been damaged thereby.

12.    Defendant NexCen is a Delaware corporation with its principal executive offices located at 1330 Avenue of the Americas, 34th Floor, New York, New York.

13.    Defendant David S. Oros ("Oros") was, at all relevant times, Chairman of the Board of Directors and a Founder of the Company.

14.    Defendant Robert W. D'Loren ("D'Loren") was, at all relevant times, the Company's President and Chief Executive Officer ("CEO").

15.    Defendant David B. Meister ("Meister") was, at all relevant times, the Company's Chief Financial Officer ("CFO").

16.    Defendants Oros, D'Loren and Meister are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of NexCen's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and/or had unrestricted access to such copies, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false

4

and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

17.    NexCen acquires and manages global brands, generating revenue through licensing and franchising. They currently own and license the Bill Blass and Waverly brands, as well as seven franchised brands. Two franchised brands - The Athlete's Foot and Shoebox New York - sell retail footwear and accessories. Five are quick-service restaurants - Marble Slab Creamery, MaggieMoo's, Pretzel Time, Pretzelmaker, and Great American Cookies.

### Materially False and Misleading
### Statements Issued During the Class Period

18.    The Class Period begins on May 10, 2007. On this day, the Company issued a press release entitled "NexCen Brands Reports First Quarter 2007 Results." Therein, the Company, in relevant part, stated:

> NexCen Brands, Inc. (Nasdaq: NEXC)("NexCen" or the "Company") today commented on financial results for the first quarter ended March 31, 2007. The Company's detailed results are included in its Quarterly Report on Form 10-Q which was filed with the SEC today.
>
> **First Quarter Ended March 31, 2007**
>
> The results for the first quarter include:  (a) The Athlete's Foot ("TAF") for the entire quarter, (b) Bill Blass from February 15 (date of acquisition), and (c) MaggieMoo's and Marble Slab from February 28 (their date of acquisition).
>
> *Licensing, royalty and franchise fee revenues totaled $3.9 million for the quarter.*
>
> *Net loss, which includes income from discontinued operations of $447,000, was ($198,000).* The net loss per share calculates to

$0.00. Included in the net loss is stock compensation expense of $640,000, or $0.01 per share.

## Other Company News

In a separate press release issued earlier this month, the Company announced that it has completed the acquisition of the Waverly brand for $36.75 million in cash and the issuance of a warrant for the purchase of 50,000 common shares.

Robert D'Loren, President and CEO of NexCen Brands, Inc. commented, "I am pleased with the continued growth in our brand portfolio. We made great progress in the quarter in integrating our existing portfolio of brands, as well as, with respect to entering into a definitive agreement to acquire a leading home furnishings brand, Waverly. On an annualized basis, Waverly generates $9 million in royalty revenue, diversifies our brand portfolio and compliments our Bill Blass home business. Also, we have new franchise agreements for The Athlete's Foot in 3 countries, Sweden, Egypt, and Lebanon. In the past 9 months, we have acquired 5 brands that are expected to generate in excess of $1 billion in annual retail sales that consists of over 1,150 franchised stores, with over 500 new stores in the pipeline, we now conduct business in 45 countries. *We remain focused on executing our business plan of leveraging our brands across our three operating verticals to generate organic and synergistic growth and plan to continue on our course of acquiring from 3 to 5 companies per year."*

## 2007 Guidance

Taking into account revenue generated by the Company's existing brands, including Waverly, *the Company is rearming revenue guidance for the full year of 2007 of between $38 and $42 million and EPS guidance of $0.12 to $0.14 per fully diluted share.* These amounts do not reflect any additional acquisitions that might be completed in 2007, although the Company anticipates that it will continue to make acquisitions through the remainder of 2007. *Assuming that no other acquisitions are completed, the Company estimates that EPS would be $0.19 to $0.21 per fully diluted share on a forward twelve month basis.* [Emphasis added.]

19.    On August 6, 2007, the Company issued a press release entitled "NexCen Brands

Accesses $22 Million of Existing $150 Million Debt Facility to Finance Intellectual Property

Assets of Waverly." Therein, the Company, in relevant part, stated:

> ***NexCen   Brands,   Inc.   (Nasdaq:   NEXC)   ("NexCen")
> announced today that it has drawn down $22 million from its
> existing $150 million debt financing facility to finance the
> intellectual property (IP) assets of Waverly, one of the most
> recognized  brands  in  home  furnishings.*** As  previously
> announced,  NexCen  entered  into  a  master  loan  agreement
> arranged  by  BTMU  Capital  Corporation  to  support  the
> Company's  strategic  goals  by  providing  capital  for  the
> acquisition  of  IP  centric  companies  in  its  three  operating
> verticals.
>
> Robert  W.  D'Loren,  President  and  CEO  of  NexCen,
> commented,  ***"With an established financing platform firmly
> in place, NexCen can successfully complete transactions that
> could  otherwise  be  more  difficult  to  conclude.*** We  are
> confident that this facility will continue to give us the ability to
> grow and execute our business plan."
>
> The  master  loan  agreement  with  BTMU  Capital  Corporation
> allows  for  borrowings  up  to  $150  million.  Draws  under  the
> agreement of $26.5 million and $27.3 million were used to
> leverage NexCen's acquisitions of The Athlete's Foot and Bill
> Blass,  respectively.  The  Waverly  draw-down  was  on  terms
> consistent with the existing agreement of LIBOR plus 240 basis
> points, or approximately 7.75%, payable in five years.
>
> Theodore  J.  Gaffney,  Executive  Vice  President  of  BTMU
> Capital  Corporation,  commented:  "We  are  excited  about  our
> growing  relationship  with  NexCen  Brands  and  its  recent
> business  activities.  This  facility  is  a  win-win  for  both  parties  in
> that  it  will  allow  NexCen  to  continue  to  finance  future
> acquisitions under the terms of the master loan agreement and
> build  a  well-diversified  pool  of  assets.  Once  an  adequate  level
> of  diversity  is  achieved,  it  will  allow  us  to  arrange  a
> refinancing through a term loan facility." [Emphasis added.]

20.    On August 7, 2007, the Company issued a press release entitled "NexCen

Brands Acquires Pretzel Time and Pretzelmaker Franchise Concepts." Therein, the

Company, in relevant part, stated:

NexCen Brands, Inc. (Nasdaq: NEXC) ("NexCen") announced today that it has acquired the assets of Pretzel Time Franchising, LLC ("Pretzel Time") and Pretzelmaker Franchising, LLC ("Pretzelmaker"), which are wholly owned subsidiaries of Mrs. Fields Famous Brands, LLC ("Mrs. Fields"). *The combined purchase price for the transaction is $29.4 million, and consists of $22.1 million of cash, and NexCen common stock valued at approximately $7.3 million.* These transactions double the number of brands in NexCen's quick service restaurant (QSR) portfolio, which also includes the premium, hand-mixed ice cream chains MaggieMoo's and Marble Slab Creamery. [Emphasis added.]

21.    On August 9, 2007, the Company issued a press release entitled "NexCen Brands

Reports Second Quarter 2007 Results." Therein, the Company, in relevant part, stated:

NexCen Brands, Inc. (Nasdaq: NEXC) ("NexCen") today reported its financial results for the second quarter ended June 30, 2007.

Commenting on the quarter, Robert D'Loren, President and CEO of NexCen Brands, Inc., noted, *"I am extremely gratified by the extent of our accomplishments and our ability to quickly become operationally profitable.* During the quarter, we directed a considerable amount of effort toward building NexCen's operating infrastructure and improving the depth of our management team, including the addition of new presidents in our QSR and home businesses. It is important for shareholders to understand that our goal is to make accretive and synergistic acquisitions, and to support and grow each of our operating verticals. I believe that we made great strides in advancing these goals during the quarter."

Mr. D'Loren further stated, *"I am pleased about the recent acquisition of Pretzel Time and Pretzelmaker, as these brands and their related products mark the beginning of the Company's revenue growth strategy for its ice cream QSR concepts."*

*For the quarter ended June 30, 2007, NexCen reported that total revenues increased to $8.9 million, compared to $3.9 million in the first quarter of 2007.* Income from continuing operations was $650,000 or $0.01 per share, compared to a loss from continuing operations of ($645,000) or ($0.01) per share for the first quarter of 2007. Income from continuing operations for the second quarter included stock-based compensation expense of $731,000 and transition costs of approximately $450,000 relating

to the integration of the Company's franchising operations in its Atlanta location, which reduced operating income by approximately $0.02 per share. *The Company reported a net loss of ($245,000) or ($0.01) per diluted share for the quarter, compared to a net loss of ($198,000) or ($0.00) per share for Q1 2007.*

As of June 30, 2007, NexCen had cash and cash equivalents of $27 million, total assets of $273 million, long-term debt of $54 million and deferred revenues of $5.7 million.

Mr. D'Loren concluded, "One of the most exciting events during the second quarter took place at our TAF Global Franchise Convention in Las Vegas in June, where we introduced our vision for the future of The Athlete's Foot ("TAF") to approximately 70 TAF franchisees, representing over 600 stores throughout the world. We presented an innovative, modular merchandising system that will allow each store location to more closely align its product offering with local demographics and buying tastes. In addition, we introduced our new line of high margin, TAF branded apparel. Both of these introductions were received enthusiastically by the franchisees in attendance. Adding to our excitement about TAF was the recent signing of an agreement with an existing TAF area developer, to open a minimum of 100 new domestic stores over the next 14 years." [Emphasis added.]

22.    On September 7, 2007, the Company issued a press release entitled "NexCen Brands Accesses $16 Million of Existing $150 Million Debt Facility to Finance Intellectual Property Assets of Pretzel Time and Pretzelmaker." Therein, the Company, in relevant part, stated:

NexCen Brands, Inc. (Nasdaq: NEXC) ("NexCen") announced today that it has *drawn down $16 million from its existing $150 million debt financing facility to finance the intellectual property (IP) assets of Pretzel Time and Pretzelmaker,* two of the most recognized brands in the premium hand rolled pretzel business that NexCen acquired in August 2007. As previously announced, NexCen entered into a master loan agreement arranged by BTMJJ Capital Corporation to support the Company's strategic goals by providing capital for the acquisition of IP centric companies in its three operating verticals.

Robert W. D'Loren, President and CEO of NexCen, commented, *"With an established financing platform firmly in place, NexCen can successfully complete transactions that would otherwise be more difficult to conclude. We are confident that this facility will*

*continue to give us the ability to grow and execute our business plan."* [Emphasis added.]

23.    On November 8, 2007, the Company issued a press release entitled "NexCen Brands Reports Third Quarter 2007 Results," wherein it announced quarterly total revenues of $11.4 million and net income of $117,000. Additionally, the Company, in relevant part, stated:

> Commenting on the quarter, Robert D'Loren, President and CEO of NexCen Brands, Inc., noted, "I am extremely pleased with the favorable advancements of our company during the third quarter. *The investments we have made in our brands, people and infrastructure are now beginning to show results. I remain confident that we have developed an extremely robust and scaleable operating platform from which to grow our business."*
>
> "During the quarter, we experienced positive momentum within each of our operating segments," continued Mr. D'Loren. In retail franchising, our rebranding efforts at The Athlete's Foot (TAF) have been met with strong acceptance as evidenced by the signing of three separate area development agreements to open a minimum of 130 stores in the United States and Sweden. In addition, we are delighted to have aligned ourselves with Li & Fung, a global supply chain manager to retailers, to serve as our manufacturing and distribution partner for Taftec(TM), the new TAF branded apparel line. In our quick service restaurant (QSR) segment, we acquired Pretzel Time and Pretzelmaker, doubling the number of brands in our QSR portfolio, which provides us strong cross-selling opportunities within our existing locations. In our consumer branded products segment, Bill Blass significantly advanced its licensing efforts, first through a licensing agreement with The Global Fur Group to manufacture and distribute luxury fur products under the Bill Blass label; and second through an exclusive licensing agreement with Mondani to manufacture and distribute handbags, small leather goods and cosmetic toiletry cases. We believe these agreements reflect the underlying strength of the Bill Blass brand and our ability to broaden the scope of this preeminent name in luxury fashion."
>
> The results for the third quarter of 2007 included: (a) The Athlete's Foot, Bill Blass, MaggieMoo's, Marble Slab and Waverly for the entire quarter, and (b) Pretzel Time and Pretzelmaker since August 7 (the date of acquisition), or less than 60 days.

The results for the first nine months of 2007 included: (a) The Athlete's Foot for the entire nine months, (b) Bill Blass from February 15 (date of acquisition), (c) MaggieMoo's and Marble Slab from February 28 (date of acquisition) (d) Waverly from May 2 (date of acquisition) and (e) Pretzel Time and Pretzelmaker from August 7 (date of acquisition). The Company did not own any of these brands during the first nine months of 2006.

*   *   *

**Guidance**

***The company expects full year Non-GAAP net income to be in the range of $0.11 to $0.13 per diluted share for 2007 and $0.19 to $0.21 per diluted share for 2008, assuming no additional acquisitions.*** [Emphasis added.]

24.    On January 29, 2008, the Company issued a press release entitled "NexCen Brands

Acquires the Great American Cookie Company(R) From Mrs. Fields Famous Brands." Therein, the

Company, in relevant part, stated:

> ***NexCen Brands, Inc. (Nasdaq: NEXC) ("NexCen") announced today that it has acquired the Great American Cookie Company ("Great American Cookies") from Mrs. Fields Famous Brands, LLC ("Mrs. Fields"). The purchase price of the transaction is $93.7 million, and consists of approximately $89.0 million of cash and NexCen common stock valued at approximately $4.7 million.*** This transaction adds another premium treat brand to the four brands in NexCen's quick service restaurant (QSR) portfolio, which include the premium, hand-mixed ice cream chains MaggieMoo's and Marble Slab Creamery, as well as the hand-rolled pretzel chains Pretzel Time and Pretzelmaker. The Great American Cookies acquisition marks the ninth brand added to NexCen Brands portfolio and increases its franchise locations from 1,600 to 1,900 locations worldwide.
>
> Founded in 1977, the Great American Cookie Company provides cookies, cupcakes, brownies, and smoothies to a diverse and loyal customer base. The company has demonstrated more than 30 years of consistent growth and is the number one mall-based cookie system in the United States. As of December 31, 2007, Great American Cookies had nearly 300 franchised units primarily located in the continental United States.
>
> Commenting on the acquisition, Robert W. D'Loren, President and CEO of NexCen, stated, ***"Great American Cookies is a great***

11

*opportunity for us to enter the cookie business with a premium cookie brand that has grown consistently over the years. The brand is representative of the acquisition opportunities NexCen has targeted to grow our QSR segment and to increase sales in our existing ice cream and pretzel concepts. The addition of this brand to our QSR portfolio provides NexCen with nearly 300 additional doors for the delivery of quality treat products, and broadens our franchise offering for interested franchisees, both domestically and internationally."*

Stephen Russo, President and Chief Executive Officer of Mrs. Fields, added, "NexCen Brands' acquisition of Great American Cookies will enable Mrs. Fields to focus on our core business strategy, with the comfort and belief that NexCen's franchise model will continue to build this brand. We are exploring opportunities to make additional investments in our brands in accordance with our indenture requirements, and are pleased with our progress to date."

*For a portion of the purchase price, NexCen accessed its debt facility with BTMU Capital Corporation, which was increased from $150 million to $181 million.* Theodore J. Gaffney, Executive Vice President of BTMU Capital Corporation, commented: *"We are pleased with our relationship with NexCen Brands and its recent business activities. Our facility has continued to allow NexCen to finance its acquisitions under the terms of the master loan agreement and build a well diversified pool of assets."*

\*   \*   \*

**2008 Guidance**

*The Company has revised its guidance to non-GAAP EPS range of $0.27 - $0.30 per share.* [Emphasis added.]

25.    On March 14, 2008, the Company issued a press release entitled "NexCen Brands

Reports 2007 Financial Results." Therein, the Company, in relevant part, stated:

NexCen Brands, Inc. (Nasdaq: NEXC) recorded revenue of $34.4 million in 2007, its first full year of brand-management operations. This compares to $1.9 million in 2006, which included less than two months of comparable operations with just one brand.

On a GAAP basis, the company recorded a net loss of $4.6 million, or $0.09 per share, for 2007.

On a non-GAAP basis, we earned $4.9 million, or $0.09 per diluted share. This excludes the non-cash expenses of depreciation and

amortization, stock based compensation, and the provision for deferred income taxes; as well as the loss from discontinued operations. EBITDA, as adjusted, was $8.8 million, or 26 percent of revenue. Schedules that reconcile non-GAAP measures to the most comparable GAAP measures are attached.

*For the fourth quarter of 2007, revenue was $10.3 million, up from $1.9 million in the fourth quarter of 2006. On a GAAP basis, the net loss for the quarter was $3.8 million, or $0.07 per share. On a non-GAAP basis, net income was $0.3 million.*

*"We have now completed the first year of our long-term plan to acquire and manage internationally-recognized franchise and consumer brands, and we have made dramatic progress,"* said CEO Robert W. D'Loren. "We have acquired nine strong brands. We have assembled a first-class team of experienced professionals at NexCen - and partnered with industry-leading designers, manufacturers, and franchise operators worldwide.

*"From a financial perspective, we earned $0.09 per share on a non-GAAP basis, two cents short of our goal for 2007. But we have an additional $0.07 per share of net deferred revenue on our balance sheet, reflecting $4.7 million of franchise sales that have already been made, but cannot be recognized as revenue until the stores are opened.*

*"Looking ahead, our emphasis will be on marketing, franchise sales, and operational excellence, which will drive cash flow and profitability.* At the same time, we intend to continue to acquire complementary brands. We will maintain our disciplined approach to acquisitions, buying companies only if they immediately add to shareholder value. We are very excited about our business and the many opportunities that we are pursuing."

**Earnings Guidance**

*NexCen Brands is reaffirming the current expectations of earning $0.27 to $0.30 per diluted share on a non-GAAP basis in 2008.*

\*   \*   \*

**Acquisition Financing**

*Our objective is to acquire from three to five brands per year in 2008 and 2009. Our acquisitions are financed with a combination of debt, cash on hand, and stock We currently have borrowed the full amount under our $180 million credit facility with BTMU Capital Corporation. We are exploring opportunities to convert this credit facility into a long-term, fixed-rate security.* Our management team has a successful track record of underwriting

and placing securities of this nature in various economic environments. Therefore, we expect to continue to have access to capital. [Emphasis added.]

26.    On March 21, 2008, the Company issued a press release entitled "NexCen Brands Appoints Chief Financial Officer." Therein, the Company, in relevant part, stated:

> NexCen Brands Inc. (Nasdaq: NEXC) has appointed Kenneth J. Hall, 50, as Executive Vice President, Chief Financial Officer and Treasurer, effective March 25, 2008. He will be responsible for all aspects of the company's financial management and human resources functions. *He replaces David Meister, who is leaving the company.* [Emphasis added.]

27.    On or about March 21, 2008, NexCen filed its Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by the Individual Defendants, and, in relevant part, stated:

> **Great American Cookies**
>
> Founded in 1977 on the strength of an old family chocolate chip cookie recipe, Great American Cookies has set the standard for gourmet cookie sales in shopping centers nationwide. With a strategy and quality product that has propelled over 30 years of growth, Great American Cookies now leads as the mall-based cookie system with approximately 300 franchised units primarily located in the continental United States.
>
> On January 29, 2008, we acquired substantially all of the assets of Great American Cookie Company Franchising, LLC and Great American Manufacturing, LLC for the purchase price of approximately $93.65 million, consisting of $89 million in cash and $4.65 million of our common stock (approximately 1.1 million shares which were valued at $4.23 per share, the closing price per share of our common stock the day immediately prior to the closing date). To finance the acquisition, we borrowed $70 million under the BTMU Credit Facility, which was increased from $150 million to $181 million at that time.
>
> Our total borrowing to date under the BTMU Credit Facility is approximately $181 million. Repayments of our borrowings through December 31, 2007 totaled $1.2 million. For a discussion of risks associated with borrowings, see Item IA. Risk Factors under the caption "Risks of Our Business - Any failure to meet our debt

obligations would adversely affect our business and financial condition."

\* \* \*

***Any failure to meet our debt obligations would adversely affect our business and financial condition.***

On March 12, 2007, we entered into a $150 million master loan agreement with BTMU Capital Corporation ("BTMU"). In connection with the financing of our acquisition of Great American Cookies on January 29, 2008, we increased the maximum amount of borrowing that may be outstanding at any one time from $150 million to $181 million and modified certain defined terms used in the original loan documentation and related documents to take into account the Company's acquisition of real estate assets in the Great American Cookies transaction. ***With the exception of these changes, the increase to the BTMU Credit Facility is substantially on the same terms as the original credit facility.***

As of March 14, 2008, we have approximately $179 million of long-term debt outstanding under the master loan agreement with BTMU. Interest rates for our master loan agreement vary based upon changes in the debt service coverage ratio, which is the outstanding balance compared to operating revenue of the underlying collateral, and based changes in the London Interbank Offering Rate ("LIBOR").

Our master loan agreement contains affirmative and negative covenants customary for senior secured credit facilities, including, among other things, restrictions on indebtedness, liens, fundamental changes, loans, acquisitions, capital expenditures, restricted payments, transactions with affiliates, common stock repurchases, dividends and other payment restrictions affecting subsidiaries and sale leaseback transactions. Although these covenants are limited to the collateral-holding entities and do not apply to the Company itself, our failure to comply with the financial and other restrictive covenants relating to our indebtedness could result in a default under the indebtedness, which could materially adversely affect our business, financial condition and results of operations. These restrictions may also limit our ability to operate our businesses and may prohibit or limit our ability to enhance our operations or take advantage of potential business opportunities as they arise.

As a result of our indebtedness, a substantial portion of cash flow from our operations is needed to pay principal and interest. This

reduces the cash available to finance our operations and other business activities and could limit our flexibility in planning for or reacting to changes in our business. Although the master loan agreement does not restrict our ability to obtain future financings, it may limit our ability to do so, which could negatively impact our business, financial condition, results of operations and growth. The amount of our debt may also cause us to be more vulnerable to economic downturns and adverse developments in our business.

\*   \*   \*

As of December 31, 2007, we had available cash on hand of approximately $46 million. We used approximately $22 million of this balance in connection with the acquisition of Great American Cookies in January 2008. We were able to increase our BTMU Credit Facility to $181 million (as discussed below) to finance the remainder of the acquisition costs. *We anticipate that cash on hand and cash generated from operations will provide us with sufficient liquidity to meet the expenses of operations, including our debt service obligations, for at least the next twelve months.* As discussed below, additional sources of capital will be needed to fund additional acquisitions, even taking into account anticipated cash flows from operations.

\*   \*   \*

On March 12, 2007, NexCen Acquisition Corp. ("the Issuer"), a wholly owned subsidiary of the Company, entered into a master loan agreement with BTMU Capital Corporation. This master loan agreement provides for borrowings pursuant to the issuance of a single class of notes to the Issuer and its wholly-owned subsidiaries ("Co-Issuers") which are jointly and severally liable for payments required under the notes. The assets of the Issuer and Co-Issuers, which consist of the respective IP assets and the related royalty revenues and trade receivables, are pledged as collateral security under each note, and secure the obligations of the Issuer and all Co-Issuers under all of the notes. The notes are non-recourse to NexCen Brands, Inc. Each note is repayable in full after five years. Substantially all revenues earned by the company are remitted to "lockbox accounts" that have been established in connection with the agreement (See Note 2(d)). The facility has no expiration date and can be terminated by the Co-Issuers upon thirty days notice and by BTMU Capital Corporation by electing not to fund future advances; however, each note funding maintains its respective maturity date. The agreement provides for certain restrictions on the Issuer and Co-Issuers, including limitations on payment of dividends and expenditures on fixed assets. The

maximum aggregate amount of borrowings that may be outstanding at any one time under the agreement is $150 million. *In January, 2008, this limit was increased to $181 million when we acquired Great American Cookie. The borrowing rate is LIBOR plus an interest rate margin, which ranges from 1.50% to 3.00%. However, a portion of the notes relating to Great American Cookies for $35 million is priced at LIBOR plus 3.50%.* The Company may refinance all or part of the notes with no pre-payment penalties. This allows us to refresh available borrowing capacity under the facility, such as by completing securitization transactions involving certain of our acquired IP assets and using the proceeds from these transactions to repay notes under the master loan agreement. The borrowing rate is based on 3-month LIBOR which is a floating rate. The LIBOR rate resets every 90 days. [Emphasis added.]

28.    The statements contained in ¶¶ 18-25 and 27 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that in order to finance its Great American Cookies acquisition, the Company agreed to an accelerated redemption feature, which forced the Company to pay back half of the amount borrowed by a particular date; (2) that the Company could not comply with the accelerated-redemption feature; (3) that as a result, the Company would suffer a reduction in the amount of cash at its disposal; (4) that the Company was experiencing a continuous weakening in its financial condition due to its debt; (5) that the Company lacked adequate internal and financial controls; and (6) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

## The Truth Begins to Emerge

29.    On May 19, 2008, the Company shocked investors when it issued a press release entitled "NexCen Brands Provides Business Update." Therein, the Company, in relevant part, stated:

> NexCen Brands, Inc. (NASDAQ:NEXC) today provided a business update.

17

*The company announced that it will delay the filing of its Quarterly Report on Form 10-Q for the quarter ended March 31, 2008 and that it expects to amend the company's Annual Report on Form 10-K for the fiscal year ended December 31, 2007.* The company filed a Current Report on Form 8-K this morning which provides more detail on these matters.

*In the course of preparing its first quarter 2008 10-Q and following the appointment of its new Chief Financial Officer, the company conducted a review of its prior public filings, including the terms of the January 2008 amendments to its bank credit facility. NexCen's bank credit facility with BTMU Capital Corporation was amended in January 2008 at the time of the acquisition of the Great American Cookie business. The amendments allowed NexCen to borrow an additional $70 million to finance a portion of the acquisition purchase price and included an accelerated-redemption feature applicable to $35 million of the $70 million. Specifically, the amendments require that the $35 million be reduced to $5 million by October 17, 2008. The company concluded that disclosures regarding the accelerated-redemption feature of its bank credit facility, as well as other changes that reduced the amount of cash available to the company for general use, were not contained in the company's 2007 Annual Report on Form 10-K or the January 29, 2008 Current Report on Form 8K filed in connection with the acquisition of Great American Cookies.*

*Based on information that is now known, the company believes that there is substantial doubt about its ability to continue as a going concern, and pending completion of an independent review discussed below, that this substantial doubt also may have existed at the time the company filed its 2007 10-K.* The company is continuing to review all of the relevant facts and circumstances. To assist in evaluating and resolving these matters, the audit committee of the company's Board of Directors has retained independent counsel to conduct an independent review of the situation. *The company has concluded that its 2007 financial statements should no longer be relied upon and no reliance should be placed upon KPMG's audit report dated March 20, 2008, or its report dated March 20, 2008 on the effectiveness of internal control over financial reporting as of December 31, 2007, as contained in the company's 2007 10-K.*

The company will determine what changes need to be made to its 2007 10-K and expects the changes may include additional footnote disclosure in the audited financial statements regarding amendments to its bank credit facility, footnote disclosure regarding going

concern considerations, and updates to certain other disclosures relating to the amendments to the bank credit facility and the company's liquidity and financial condition. KPMG is also expected to amend its audit report dated March 20, 2008.

However, the company does not expect there to be any changes to its 2007 financial results.

The company is notifying The Nasdaq Stock Market that it will not timely file its first quarter 2008 10-Q with the Securities Exchange Commission. As a result of the delayed filing, NexCen will not be in compliance with the Nasdaq Marketplace Rule 4310(c)(14) that requires that the company timely file all required reports with the SEC to satisfy continued listing.

*   *   *

*The company expects to report revenues of $13.9 million in the first quarter of 2008 compared with $3.9 million in the first quarter of 2007 and $10.2 million in the fourth quarter of 2007.*

*   *   *

*NexCen's prior guidance for its expected financial results for 2008 is no longer applicable.* [Emphasis added.]

30.    30.    On this news, the Company's shares fell $1.95 per share, or 77.08 percent, to close on May 19, 2008 at $0.58 per share, on unusually heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

31.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased NexCen's securities between May 10, 2007 and May 19, 2008, inclusive (the "Class Period") and who were damaged thereby.    Excluded from the Class are defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which defendants have or had a controlling interest.

32.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NexCen's securities were actively traded on the

National Association of Securities Dealers Automated Quotation ("NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NexCen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

34.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of NexCen; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

36.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

37.     The market for NexCen's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements, as well as failures to disclose, NexCen's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired NexCen's securities relying upon the integrity of the market price of NexCen's securities and market information relating to NexCen, and have been damaged thereby.

38.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of NexCen's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

39.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about NexCen's financial well-being, business relationships, and prospects. These material misstatements and omissions had the cause and effect of creating in the market an

unrealistically positive assessment of NexCen and its financial well-being, business relationships, and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

40.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

41.     During the Class Period, Plaintiff and the Class purchased NexCen's securities at artificially inflated prices and were damaged thereby. The price of NexCen's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

42.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding NexCen, their control over, and/or receipt and/or modification of NexCen's allegedly materially misleading

misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning NexCen, participated in the fraudulent scheme alleged herein.

43.    Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 264,783 shares of the Company's stock for gross proceeds of $3,310,000, including over $2 million in gross proceeds received by Defendant Oros. This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| June 5, 2007 | Oros, David S. | 21,589 | $12.81 - $13.02 | $279,000 |
| June 4, 2007 | Oros, David S. | 26,300 | $13 - $13.05 | $343,000 |
| June 1, 2007 | Oros, David S. | 116,894 | $13 - $13.16 | $1,529,000 |
| May 17, 2007 | Dunn, Jack B. | 85,000 | $11.57 - $11.57 | $983,000 |
| May 16, 2007 | Dunn, Jack B. | 15,000 | $11.73 - $11.73 | $176,000 |
| | **TOTAL:** | **264,783** | | **$3,310,000** |

**Applicability of Presumption of Reliance:**
**Fraud On The Market Doctrine**

44.    At all relevant times, the market for NexCen's securities was an efficient market for the following reasons, among others:

(a)    NexCen's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, NexCen filed periodic public reports with the SEC and the NASDAQ;

(c)    NexCen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    NexCen was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

45.    As a result of the foregoing, the market for NexCen's securities promptly digested current information regarding NexCen from all publicly-available sources and reflected such information in the price of NexCen's securities. Under these circumstances, all purchasers of NexCen's securities during the Class Period suffered similar injury through their purchase of NexCen's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

46.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded

24

herein, defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of NexCen who knew that those statements were false

when made.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

47.     Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

48.     During the Class Period, defendants carried out a plan, scheme and course of

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff

and other members of the Class to purchase NexCen's securities at artificially inflated prices.

In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of

them, took the actions set forth herein.

49.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for NexCen's securities in violation of Section 10(b)

of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in

the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

50.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about NexCen's financial well-being, business relationships, and prospects, as specified herein.

51.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NexCen's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about NexCen and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of NexCen's securities during the Class Period.

52.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants

was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

53.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing NexCen's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being, business relationships, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false and/or misleading.

54.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of NexCen's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of NexCen's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired NexCen's securities during the Class Period at artificially high prices and were damaged thereby.

55.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that NexCen was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their NexCen securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

56.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

58.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.    The Individual Defendants acted as controlling persons of NexCen within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various

28

statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

61.    As set forth above, NexCen and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 3, 2008

COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.

Lynda J. Grant (LG-4784)
150 East 52nd Street
Thirteenth Floor
New York, NY 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Steven J. Toll
Daniel S. Sommers
S. Douglas Bunch
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

*Attorneys for Plaintiff*

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, __FRANK B. FALKSTEIN__ ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed a class action complaint asserting securities claims against NexCen Brands, Inc. ("NEXC"), and wish to join as a plaintiff retaining Cohen, Milstein, Hausfeld & Toll, P.L.L.C. as my counsel.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in NEXC during the Class Period of May 10, 2007 through May 19, 2008 were as follows:

| DATE | TRANSACTION (buy/sell) | NO. OF SHARES | PRICE PER SHARE |
|------|------------------------|---------------|-----------------|
| 11/8/07 | Buy | 200 | 5.57 |
| 1/22/08 | Buy | 100 | 3.75 |
| 3/17/08 | Buy | 200 | 3.16 |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in any action under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing true and correct.

Executed this __20__ Day of __June__, 2008.

_____

379559.1 1

Marano002